Mr. Chief Justice, and may it please the Court, Respondent's position is that when Congress said, arrives in the United States, it meant stopped outside the United States. That theory is wrong for the simple reason that it defies the statutory text. You can't arrive in the United States while you're still standing in Mexico. That should be the end of this case. But even if you see some ambiguity in the text, the Court's decision in Thale should clinch the case for us. In Thale, this Court determined that the protections of the Refugee Convention and the Withholding of Deportation Statute do not extend to aliens outside the United States, and further, that it is entirely lawful for the Executive Branch to prevent aliens from reaching U.S. soil and claiming those protections. If Congress meant to depart from that territorial approach when it adopted the statute here just three years after Thale, it would have said so. It didn't. This Court should therefore uphold the metering policy and reverse the Ninth Circuit's judgment. Are there treaty obligations that are implicated by either the metering policy or the issues here? No, there are not, Justice Thomas. Respondents rely primarily here on the Refugee Convention and the protocol. But there are two reasons for which those don't apply in this case, and those aren't violated by metering. The first is, as this Court held in Thale, those provisions simply don't apply extraterritorially. They apply to the return of someone from the United States, not to, in Thale, the return of Haitian refugees who were interdicted in international waters. And secondly, even where that convention does apply, what it prohibits is returning someone to a foreign country. Metering doesn't return anyone to Haiti or Guatemala or wherever the person might be coming from. It just says you can't set foot in the United States. I'm not sure that I understand how you can say that we're not violating our treaty obligations with your reading, and why you think Thale protects you. Thale very clearly says that U.S. asylum and withholding protections apply to those who reside in or have arrived at the border of the United States. It also explained that refoulement means a defensive act of resistance or exclusion at the border, not merely returning a person to a country. Now the Refugee Act was passed in response to the MS St. Louis situation, which was a ship in 1939 carrying over 900 Jewish refugees that landed in Cuba. The refugees weren't permitted to unload themselves. It then came to the coast of Florida, and the U.S. wouldn't let it dock at all and turned it back, and it did the same in Canada. Canada wouldn't let it dock. So the Refugee Act was passed to ensure that people who arrived at a border and knocked on the door, because that's what you're saying, these are people who come to the line, there's an agent standing at the line that's open to everybody else except refugees, correct? They're letting in workers with permits to come into work, they're letting everybody else in, but they're not permitting the people who come to the line, to the door, and knock on it, who want to claim refugee status, you're saying, we're not going to inspect you. How does that not violate the Refugee Treaty Act, or the spirit of the St. Louis U.N. Convention? To start with the statute, the statute doesn't say, arrive at the door, arrive at the border. No, but it says arriving in the U.S. in various provisions. The inspection provisions says, all aliens who are applicants for admission, or otherwise seeking admission, or readmission, or to, or transit through the U.S., shall be inspected by immigration officers. So various provisions of 1125 also speak about aliens arriving. Someone on a plane arriving to land in LaGuardia may not have put their foot on U.S. land, but they've arrived in the United States, they're arriving, they're knocking on the door. Again, the statute that is specifically at issue here says arrives in the United States. So if I believe that your reading violates the U.N. Convention, then what you're telling me is that Congress, when it passed this language in 1996, intended to reject its treaty obligations. No, I'm telling you... Without conversation about it, and a House report that basically said, there is no evidence that Congress, in fact, told us intended to make that provision. The House report stated that the new version of 1158 applies, quote, to any alien who is physically present in the United States, or at the border of the United States. That was the language of the House report. Not the language of the statute. The statute says, in the United States... But don't we read statutes in their context? You read statutes according to their text, and there's no ambiguity. No, you start with the text in context, correct? Mr. Suri, the text has to make sense. And what is a little concerning to me about your reading of the statute is the practical implications insofar as it suggests that a Congress that was authorizing asylum would be requiring people to break the law in order to obtain it. So imagine a polite asylum seeker who wants to do everything by the book, he approaches the border, but does not cross, precisely because the law says you are not supposed to enter the United States without authority. Why on earth would Congress have intended or meant for his asylum request to be discarded, not taken seriously, not entertained, but someone who manages to enter the United States unlawfully, when the law says you're not supposed to do it, and requests asylum, gets their application entertained? That doesn't seem to me to make any sense, but if we're trying to think about what arriving in means, surely Congress was contemplating that a person would be coming to the United States, would be doing so with an intent to comply with the law that says you're not supposed to enter, and thereby asking for entry. There are two reasons for which that makes sense. The first is that we have a separate refugee admission statute, section 1157, that protects aliens outside the United States. So it makes perfect sense for Congress to say, if you're in the United States, you go to the asylum route, and if you're outside the United States, you go to the refugee route. Yes, but I'm trying to understand the rationality of your interpretation of arriving in. You are suggesting that arriving in means the person who is literally standing on the U.S. side of the border, as opposed to the person who approaches the U.S. side of the border, and I don't understand why Congress would make that distinction. The second reason that Congress would have made that distinction, apart from the fact that the person in Mexico already has this other statute, the refugee statute, that he could turn to, is that the problem with the world's refugees is not solely the United States' burden to bear. It's a shared responsibility of nations throughout the world. No, I understand, but think about the statute at issue. It says arriving in. It first of all distinguishes physically inside, right? It says arriving in, and it gives those people the ability to ask for asylum. The way that your reading plays out, a person who is coming to, arriving in, approaching the United States can't make that ask, but they have to somehow violate the law by entering the United States in order to make that ask. All right, complete the answer. Congress could reasonably determine that if a refugee is in Mexico, then the Mexican government is primarily responsible for processing his claim. Once the refugee is in the United States, whether legally or illegally, then the United States has greater responsibility toward- I guess I don't understand how that's responsive. Can I just finish? I don't understand how that's responsive to my point, which is the person who is arriving in the United States asking for permission to enter is not necessarily, quote, in Mexico in a way that implicates all the concerns that you're talking about. Yes, he's physically standing in Mexico, but imagine a person who has a placard on their body as they approach the border that says, you know, I would like entry. I'm being persecuted in Mexico. Your suggestion that the United States would say, unless you can figure out a way to illegally cross, we're not going to entertain that claim seems very peculiar. It seems to me that the premise of the question is that there is something improper about blocking someone from completing the arrival. The premise of the question is that arriving in has to mean something, and to suggest that it means that you have to actually illegally cross doesn't make sense. There are other penalties that apply to people who illegally cross. It's a crime to illegally cross into the United States, and the fact that someone has illegally crossed into the United States can be taken into account when the person is making the asylum application. Please, counsel, the statutory language, is it arriving in, or is it arrives in? It's arrives in. Okay, thank you. Mr. Sury, if... Justice Kagan? I don't think you had much of a chance to answer the part of Justice Sotomayor's question, which I am interested in, about the treaty obligations, and particularly how the treaty obligations should or should not be interpreted in light of the St. Louis incident that gave rise to the treaty. The treaty was a compromise between the interest in protecting refugees and the interest in protecting national sovereignty, and the compromise that was reached was, we're not going to require nations to admit anyone into the country, but we're going to forbid sending people back to other countries if, once they have already entered that country. And here, the treaty doesn't apply for two reasons. One, the individuals at issue haven't entered the United States, and two, they're not being sent back to any foreign country, they're just being denied admission to the United States. I would also note that even on any interpretation of the statute, the St. Louis situation wouldn't be covered, because there's a parenthetical in the statute that talks about people interdicted in the United States or international waters, and they're covered by the statute only if they're brought to the United States. So in the St. Louis example, those individuals were not brought to the United States, and therefore, they'd be outside the scope of the statute, I think, even on respondents' reading. I think Justice Jackson's question got at the fact that your interpretation privileges someone who illegally enters over someone who legally comes close to the border, and why would Congress privilege someone who illegally enters the United States? Can you answer that directly? I think it's a bit unfair to say that we're privileging people who illegally enter, because people who legally enter are being treated better than people who illegally enter. I got that distinction. The distinction is between the illegal entrant and the person who lawfully gets very close and wants to follow the rules. That person is disadvantaged on asylum as compared to the person who illegally enters, and the question, as I understood it, is why would Congress do that? So what's the answer? Two answers to that. The first is we would deny that the person is being privileged, because metering is not saying to the person, the polite asylum seeker, in Justice Jackson's words, you can never enter the United States and your only option is to enter illegally. It's saying our port is at capacity today. Try again some other day, and that time, when that person comes in, that person could come in legally. The second answer is that Congress could reasonably determine that the United States has greater responsibilities to aliens in the United States than to aliens in Mexico. That's how sovereignty is divided among nations in the world, and whether you got here legally or illegally, Congress could say we have greater responsibilities once you're within our borders. More generally, or separately, I guess, what is the problem, what was the problem that was trying to be solved here when this policy was put in place? The policy was put in place in 2016 when ports, which might have a capacity of something like 50 or 100 people, holding capacity of 50 to 100 people, were facing lines of aliens far larger than that. And those individuals were demanding entry at that particular time, and ports were overwhelmed. Sometimes they didn't have enough food to feed people arriving in the United States. Sometimes they didn't have beds in which they could sleep. They didn't have places where they could hold them. So it was necessary for the ports to say, sorry, we're at capacity. Try again some other time. And I think respondents' position is that that is categorically illegal in any circumstances because it always violates the asylum statute and the inspection statute to say we're full right now. That's not quite what they're saying. It's certainly not what the circuit court said. What the circuit court said was we have a law that permits the United States to have people reside in Mexico or stay in Mexico while the application is being considered. So there is already that remedy for the government, correct? There is a contiguous territory return provision. Exactly. And what the circuit said is it's okay for you to say stay somewhere else while we process this. What you can't do is do what the statute doesn't permit you to do, which is not to inspect me at all. The circuit said you can make a list of people and have a rational basis to tell them to come back in a particular time. But instead what you were doing was saying, you alien, we're not going to even consider your application. We're not going to take your number. We're not going to do anything. We're just going to turn you back. We're going to be the ship on the MS Lewis and ship you back to be killed wherever you end up. And that's what the statute doesn't permit. Now, you mentioned- Can I answer that? Yes. That's an argument that sale is wrongly decided because that's exactly what the United States was doing in sale, shipping people back to Haiti. No, because sale made very clear that the UN obligation is if you're a refugee who's arriving at the port of entry, if you're knocking on the door and I'm staring you in the face, you have an obligation to at least listen to my application. And you can tell me to wait. You can put me in a safer place to wait. You can do a bunch of different things. What you can't do is just turn me back from the border. And the second answer is we're not shipping people back to Haiti or whichever country the person might be coming from. No, you're just letting them walk back. The people on the St. Louis could have flammed back. They happened to be on a boat, but that's what we did. They were off the coast of Florida and we didn't let them dock. And take an interview them at all. We didn't consider whether they were being persecuted. And the majority of those people were shipped back or had to go back from where they came and were killed. That's what we're doing here, isn't it? Like the court in sale, I do not deny the moral weight of claims made by refugees. But that is not the question before the court. Would you complete your answer? The question before the court is what obligations should Congress impose in the asylum and inspection statutes and those refer only to aliens who arrive in the United States. May I ask you a question about the statute and about that answer? You know, I totally get that if you just look at the language who arrives in the United States, it sort of suggests, well, you have to be in the United States. So totally get that. It does seem to me that this statute, you don't have to be a superfluity hawk to think that this statute has a massive superfluity argument problem. Because the way you're understanding that second phrase, the statute ends up saying essentially any alien who was in the United States or who was in the United States. So what led to that kind of superfluity in this statute and how are we to understand it? It really, if you just sort of, you can't mean that. So the in the United States must mean something else. I agree that the arrives category is a subset of the present category, but there are a few different reasons why Congress might have mentioned that subset the same way it mentioned subsets and other statutes that refer, for example, to money or property. One reason is that the arrives category is subject to special rules that other applicants for admission are not subject to. For example, they're automatically subject to expedited removal if they are inadmissible. So when the statute 1225 is talking about the arrives category repeatedly in later provisions, it makes sense to mention them separately in the definitional provision. The second reason is that immigration law has historically drawn a distinction between deportation proceedings for people in the interior of the United States and exclusion proceedings for people who've just arrived in the country. This provision, in this provision, Congress might simply have been trying to make clear that both of those are covered. The third reason is that under the entry fiction, this court had previously interpreted terms that are close synonyms for present in the United States, like found in or within the United States to exclude recent arrivals, and Congress might have wanted to make clear that it's covering recent arrivals as well. So for all those reasons, the arrives category serves important clarifying function. You know, it also serves a sort of confusing function. When Congress did this, it must have realized or you would think it would have realized that it was just going to confuse matters to essentially say the same thing twice about an alien who was in the United States. I don't think on the entry, what is it called, the entry fiction? I mean, I don't think you would have needed this second provision to do that because you have physically present that should have tipped people off that we're not talking about the entry fiction, and we also have the language about irrespective of the alien status, which also should have tipped people off that we weren't talking about the entry fiction. So I took that to be your primary argument in the brief, and I don't think it really sort of does it. Well, if you're positing that there are already two parts of the asylum statute that are meant to address the entry fiction, then it isn't much of a stretch to say that there's a third piece as well. Secondly, the two pieces you've mentioned are not included in section 1225. It's like belt and suspenders and, you know, whatever, a new pair of pants. And the second point is those two pieces are not in section 1225. They're only in section 1158. So if Congress had included the phrase arrives in 1225 but omitted it from 1158, then people might draw a negative inference from the inclusion in one provision and the exclusion in the other. Can I just ask you, does the administration, the metering policy has been rescinded? Does the administration intend to reinstate the metering policy if it's successful in this case? The administration would like to be able to reinstate metering if and when border conditions justify. I cannot predict in advance what border conditions will look like or what specific policy responses the administration would take in response to that. So Mr. Suri, why then aren't we just issuing an advisory opinion in this case? I mean, your back and forth with Justice Sotomayor raised another line of questions that I had along the same lines as what Justice Barrett just indicated. At the time in which the district court in this case issued its opinion, the metering policy had been rescinded, and as you've now represented, the government has no concrete plans to reinstate it. So I don't understand what we are doing other than advising the government in sort of the abstract as to whether or not this kind of thing is lawful. We don't have an actual policy. We don't know who's right as between you and Justice Sotomayor about what metering actually contains because the government doesn't have a policy in effect and hasn't shown us that it wants to have a particular policy. None is on the table. So how do we even have jurisdiction, really, to be addressing this? The question of mootness turns on whether the court can grant any effectual relief whatsoever to the prevailing party. You can grant us effectual relief and the case isn't moot because there are three types of prospective orders that the district court issued that are still in place against us, the most important of which is a class-wide declaration saying we can never engage in metering at the southern border. If you agree with us, you would lift that declaration and we'd be able to resume metering. Therefore, the case is not moot. But you don't have a plan to resume it. Are you suggesting that – I'm a little worried about the judiciability in the following sense. At the time the case was initially brought, there was a policy in place, the government was engaging in metering, and obviously we had a live controversy about it. But before the district court issued its opinion, that policy was rescinded. There was no more metering, and yet I think in the record it demonstrates that the parties just sort of said to the district court, well, it would be helpful if you would go ahead and enter your ruling. That's ordinarily not the case, that you don't just have the district court opining on policies that are no longer in effect. So I appreciate that the district court did, and so you would like to get rid of the order, but why wouldn't the right remedy be to just vacate the order, rather than having us speak to the merits of it in this way? If you'd like to look at the issue through the lens of voluntary cessation, you get to the same result. Yes, we voluntarily ceased metering at one point. There are no findings about voluntary – the district court did not make findings about voluntary cessation, so I don't know how we could go there. But the test under voluntary cessation is, is it absolutely clear that the conduct can't reasonably be expected to recur, and that can't possibly be satisfied here, because we're telling you we want to do this policy again if order conditions justify it. Thank you, counsel. Justice Thomas? Justice Alito? During the period when metering was suspended, what would happen in the hypothetical situation, or not-so-hypothetical situation you were talking about, where a port was capable of handling, let's say, 50 aliens, and instead 300 wanted to enter? What was done? What was done during the previous administration differed from what was done during the Obama administration. During the previous administration, the aliens were generally paroled into the United States, and the current administration has serious concerns about that approach as a policy matter, because that means that individuals who may not necessarily be entitled to asylum are allowed to enter the United States without showing that they have a valid claim, and it may be years before the person can be found and deported if that is appropriate. Do you happen to know how many people were paroled? I don't have an exact number on that, but it would not surprise me if it was in the millions. Thank you. Justice Sotomayor? Counsel, the Office of the Inspector General issued a report that said that some of the metering that was done was not done because of lack of space. It reported on the fact that there were empty beds in at least two ports, okay? So Justice Alito assumes the moment in which there were not enough space, but there is a claim that at least one president was using this as a subterfuge for ignoring any inspection whatsoever. Do you have a response to that? Yes, I have two. The first is that we dispute those facts, and this is at the summary judgment stage, so you can't resolve those disputes in response. We do have an Office of the Inspector General report that says that, correct? True. The second answer is that respondents brought two different types of challenges to metering in the lower courts. First, a facial challenge saying metering is never okay, even if done for a legitimate reason. That's the only one before you today. And they also brought an arbitrary and capricious challenge saying even if metering is acceptable when the port is actually overcrowded, you can't use it as a subterfuge. That's not before you today. The language at issue here was passed in 1996. In 1998, the government modified its regulations to define an, quote, arriving alien as an applicant for admission coming or attempting to come into the United States at a port of entry, which is consistent with the policy that had been followed since 1980, I think it is, when the Refugee Act was passed, correct? Not correct. The courts said in Cardozo-Fonseca, when it was talking about the 1980 Refugee Act, that the asylum statute applies only to aliens in the United States. But the port, the regulations have always been treating aliens who knock on the door at a legitimate port of entry have, up until the metering policy, were at least giving them the opportunity to claim asylum, correct? I'm sorry. That's not correct either. The regulation refers to an applicant for admission, and an applicant for admission is an alien.  We're back in the same circle. Yes. All right. Justice Kagan? I'm going to take you back to the subject, Mr. Sarian, the superfluity problem. You said to me the second phrase should be viewed as a subset of the first, and I want to understand what you mean by that. What does the first include that the second does not? It includes individuals who may have arrived in the United States a long time ago, but the process of arrival has been completed. The person would be present in the United States, but the person doesn't arrive in the United States. Is that really what you're saying? Is that your best ... Because it strikes me that that's actually a better argument than the ones you've given so far, that the first phrase is people who have been here for some time, and the second phrase is meant to refer to people who may arrive right now after this statute has gone into effect. If you're intent on giving these provisions non-superfluous meanings, then we think that's the right thing to do. That's a good thing to be intent on, because this is really not like a kind of, oh, Congress didn't see that it was doing the same thing in two different parts of the statute. These phrases are right next to each other, and they must have meant ... If you're right about what arrives in mean, I'm looking for a theory as to how that doesn't repeat what the first phrase does. It's a subset, but that's different from saying that it has a completely different meaning and includes people who don't get a chance to have it. I got that, but you're essentially saying that the second phrase is a subset that's meant to respond to the fact that they've just put in a provision for expedited removal, which focuses on the same group of arriving people, and that the first provision does not really focus on this expedited removal group of arriving people, but instead applies as well, although it also applies to them, and honestly, Congress didn't really need it, but applies as well to people who have been sitting in Kansas for the last five years. It could refer, for example, to someone who comes here on a visa, the visa expires, but conditions in his home country have changed while he's been in the United States, and so now he wants to apply for asylum. He isn't in the arrives category, but he is in the present category. Thank you. Justice Gorsuch. Justice Kavanaugh. Is it lawful to impose the metering policy for the government to do that, even if a court is not overwhelmed? We believe that it is lawful, but we're not asking the court to go that far today. The only issue before the court today is this facial challenge to metering, that it always violates the inspection and asylum statutes. There are separate claims that it would be arbitrary and capricious to engage in metering as subterfuge, but that's not the issue. Okay, it wouldn't be a statutory issue, it would be an arbitrary and capricious issue, then? That's the claim that's been raised by the other side. Okay. And you make an argument, this is a relatively minor point, but it's near brief, and I didn't agree with it, so I'm going to bring it up, which is page 25. You say that because it's in a parenthetical, it's different than if it had been separated by commas or dashes. Do you really mean that? Yes, I recognize that. I mean, I know we have a case in a particular context that once said that, but I don't know that that's a general rule, that parentheses are different than dashes in interpreting statutes. I recognize that you consented in the case we're relying on. Yes. But do you think that's a general proposition, that parentheses are different than dashes or commas in interpreting statutes? Not that they're different in that sense, but that they convey an aside, and that material in parentheses, or for that matter, even in dashes, don't override unambiguous language outside the parentheses or dashes. Or commas? I think commas grammatically are— I just don't want this—I mean, I was surprised to see this, and, you know, the Constitution has things in parentheses, and I'm just trying to make sure that this doesn't expand. The Court does not need to rely on that argument. Thank you. That's a level for us.  Justice Barrett? Mr. Suri, when I asked if the administration intended to reinstate the metering policy, I didn't intend to suggest that it was formally moot, and it was my understanding—I just wanted to clarify it—that the injunction in this case still has continuing effect on members of the class because it still matters. That's right. There's a declaration that has continuing effect as to the whole class. There's also an individual injunction that has continuing effect as to one particular plaintiff, Beatrice Doe, whom the District Court ordered us to allow into the United States, and that's an additional basis for avoiding any mootness concerns. And that's why the Ninth Circuit said it wasn't moot. That's right, and that's presumably why the other side hasn't raised a mootness argument and why, even though we discussed mootness in our search stage papers, the Court still granted review. Thank you. Justice Jackson? So, under Atchison Hotels, why wouldn't we still not reach at least the injunction? Because Mrs. Doe apparently has represented that she does not intend to return to the United States, and the injunction is specifically requiring the United States to facilitate her entry. In the Atchison case, the plaintiff dismissed that plaintiff's claim and told the Court that the plaintiff was abandoning her claim entirely and acquiesced in vacater. There's nothing like that. So she would have to do more, you're saying, than to say, I'm not coming back to the United States. I think it's far too late to do any of that now, because we also have the class-wide declaration that independently keeps this case live. Right. Let me talk about the class-wide declaration. You're asking us to reach the merits of whether or not metering is lawful and reverse the district court's judgment on that basis. Why isn't vacater a permissible remedy here? I mean, I understand you'd like us to say today metering can be done, give you the okay to do it. But another way to address this, I would think, given that the district court declared a policy unlawful, even though the policy was no longer in place, and the government today is saying it has no concrete plans to reinstate it, and the district court issued this order without making any findings about whether or not a live case or controversy existed, I think one could argue that the district court at least abused its discretion by nevertheless entering this broad declaration. So it would solve your problem, I think, if the court on those grounds just vacated it. Why need we get into giving you an answer on the merits of the question of whether or not metering is lawful? The Ninth Circuit reached the issue of mootness and issued a ruling on that issue. I think it's the first footnote in its opinion. So unless you determine that that mootness holding was wrong, there's no basis for disturbing the Ninth Circuit's decision. And on mootness, we think the Ninth Circuit got it right. This case isn't moot because we'd like to reinstate metering, and we're being prevented from doing so. But you don't have a concrete plan, I just want to make clear. Concrete plans are necessary for standing, not for mootness. All right. Let me just ask you one question about your response to Justice Kagan. You were talking about the various reasons why Congress had arriving in in this statute, and that one of them, you said, was the fact that there was previously a distinction between deportation and exclusion, and that Congress was trying to ensure that that was also covered, or that the principles related to deportation and exclusion were covered by this new regime. My understanding is that exclusion applied to people who were, quote, at a land border, at a port. But your reconceptualization of what arriving in is doing does not allow for at a land border or at a port. And so, can you help me to understand how Congress could both be attempting to ensure that those principles were included, but we still agree with your reading of the statute? The phrase, at a land border, in this context, refers to people on the U.S. side of the border rather than the Mexican side of the border, and we know that in two ways. The first is the court's entry fiction cases, like Kaplan against Todd and Lengmei Ma, repeatedly refer to aliens on the U.S. side of the border who've just arrived. In the entry fiction context, but we don't have a case or a scenario in which Congress makes clear that it's responding to the entry fiction when it uses the words arriving at, right? And the second answer is that in Cardozo-Fonseca, when the statute said, at a land border, the court understood that to refer to aliens in the United States. Thank you. Thank you, Counsel. Ms. Corcoran? Mr. Chief Justice, and may it please the Court, in the 1980 Refugee Act, Congress established a statutory process for non-citizens fleeing persecution to seek protection in the United States. Congress designed the scheme to track the United States treaty obligation not to refile refugees to territories where their life or freedom would be threatened. Because reform law includes, to quote Sayle, defensive acts of resistance or exclusion at the border, the act requires immigration officers to process claims not only for non-citizens already present in the country, but also for those arriving at ports and elsewhere along the border. For decades, port officers followed the statutory procedures designated by Congress for inspecting and processing arriving asylum seekers. It was not until 2016 that the government asserted for the first time that it can wholly avoid these mandatory duties simply by blocking asylum seekers just as they are about to step over the port threshold. Petitioner's theory of the statutory text isolates the word in at the expense of making the rest of the statute nonsensical. By petitioner's account, the phrase arrives in the United States has no meaning, not already covered by present in the United States. Arrive means already arrived, and amendments that Congress intended to encourage non-citizens to lawfully seek admission, in fact, did the opposite, permitting border officers to effectively eliminate access to asylum at ports. Petitioner's position is also at odds with the original public meaning of the provisions reflected in the government's long-standing inspection practices at the time of I.I.R.A.'s enactment and in the government's own regulations, which have recognized for nearly 30 years that the act's inspection and processing duties apply to non-citizens, quote, coming or attempting to come into the United States at a port of entry. As this court observed in Thrasogam, Congress carefully crafted our asylum system to ensure that the United States lives up to its ideals and its treaty obligations towards non-citizens fleeing persecution. The turn-back policy flouted both, and the Ninth Circuit was correct to deem it a withholding of the government's statutory mandates. I welcome the court's questions. How would you distinguish this case from sale? This case is distinguishable from sale in a number of ways. One, sale involved the withholding provision alone. It didn't involve the statutory mandates that are issued here in 1225, the inspection and processing mandates. So here we have a 7061 claim about whether the government has withheld compliance with those mandates. Sale is also different from an extraterritoriality and a treaty perspective because it involves interdiction on the high seas, which as sale explained, is outside of the jurisdiction of the United States. So it raises a host of questions that aren't raised here. I'd be happy to address some of the points my friend made. Would you address 1157? Yes. So 1157 is the refugee program. My friend takes the position that we have collapsed the distinction between the two. Our position reflects the way that 1157 and 1158 operated from 1980 to 2016. So for 36 years, no one was concerned about the distinction being collapsed. And that's because they serve two entirely different functions. Section 1157's refugee program is entirely elective. The president chooses whether to admit refugees. It's not something that refugees in other countries can apply for. It's decided between the countries. There are a host of benefits you get if you were admitted through that program. But 1157 is not the provision that implements the Article 33 obligations. That happens through the asylum processing that's under 1225 and 1158. And that asylum processing is also how you determine whether someone is entitled to withholding. Mr. Suri gave some responses to Justice Kagan in saying that there's a subset of people who are arriving in the U.S. as opposed to longstanding people. The problem with that is those people who are arriving, he says, are present in the U.S. So I'm not sure how his answer gets you around the surplus problem. Yes, I agree. My friend made a number of new arguments about surplusage that weren't in the briefing, and I think that is one of them. But I would note exactly what you said. Making it a subsection doesn't mean that it's not redundant. It's still entirely redundant. Well, that's true, Ms. Corcoran, that it's a subset and so there's still redundancy. But I suppose if Congress in IARA had just created this big deal about expedited removal and said that expedited removal was what arriving people got, it might be that they just wanted to emphasize that just because you were subject to the expedited removal procedures did not mean that you still couldn't apply for asylum. So the fear, if you might say, is that if they had just had that one physically present provision and struck out what had previously been in the statute, the arrive at the port provision, somebody might have thought, like all these people that are now being subject to expedited removal do not have the right to apply for asylum. And this provision is supposed to make clear that they do. There's no reason for the inspection mandate to need to make that clear because 1225B, the asylum processing section, it's in B12A, has a whole process in place for how you assess asylum claims by arriving aliens. So that credible fear interview provision says if an immigration officer determines that an alien who is arriving in the United States has expressed a fear of future persecution, then the immigration officer shall refer them for a credible fear interview. And then there are a host of provisions that explain how that credible fear assessment plays into expedited removal. So there would be no way that someone could read the entirety of 1225 and be concerned about how it applied to arriving asylum seekers. Can I ask you a question? I feel like there's some slippage between arriving and arrives. And as the Chief Justice pointed out, the language is arrives in. I mean, arriving sounds more in the process of. Arrives in sounds more like you've reached your destination. How do you know under your theory when the person is close enough that we could say they have arrived in or arrived in the destination? I mean, what if there's a queue and they're far back? Or what if they arrive not at a port of entry? How close do you have to be to the border? Could you say that someone arrives in the United States if they're at a portion of the border that does not have a port of entry? Like, what is it? If it's not crossing the physical border, what is the magic thing or the dispositive thing that we're looking for where we say, ah, now that person we can say arrives in the United States? I'm going to try and keep that in order in my head, and I'm going to start with the first point, which is actually arrives in is the tense that triggers the inspection under 12258, but is arriving in is the language that triggers the credible fear interview. So that's the provision under 1225B that mandates asylum processing within the context of expedited removal. As the government acknowledges, and I think Your Honor just said, is arriving in does suggest a process. And, in fact, that's exactly, that determination is what's happening under the turn-back practices. So they have immigration officers standing at the border asking arriving noncitizens, what's the basis for your admission? They get right up to the borderline, and if they say, I'm here seeking asylum, then the border officer turns them away when, in fact, 1225B says that if the immigration officer determines that the person is seeking asylum, he shall refer that person to a credible fear interview. So that argument stands separate from the inspection mandate. And what used to happen is that you'd have inspection, and that's how you'd find out someone had a fear, and then that would trigger the credible fear interview. But both of those provisions are at play here. Okay. Can you answer the question about what is the dispositive thing that has to happen to say that someone arrives in? Yes. So a person arrives in the United States at a port of entry when there is a threshold of the port's entrance about to step over. So they are arriving there. I think that's consistent with ordinary meaning, I arrive at my house or I arrive in my yard when I'm going through the gate. Now, that process of arriving is interrupted by the border officer physically blocking them from completing the arrival such that the person never arrived. But the process of arriving is beginning at that moment. And is that just for the person? I mean, if there's a line, you know, and you're far back and you hear, oh, no, no, no, we can't cross the border today, have they arrived in and been turned away, or is it only the person initially told? And how could it be something different if you arrive at a port of entry versus if you cross the border or you arrive on the other side of the border, the Mexican side of the border, but say cross into Texas or try to cross into Texas where there's not a port of entry? So to start with the hypothetical where you have a line going, I think that the, I mean, our position is not that arriving in the United States is doing no work at all. The question is what arrives in the United States at a port of entry means. And I think that means you have to be at the threshold. If I'm in a line waiting to get into my house, for some reason into my yard, and I'm half a block back, I haven't actually started the process of arriving in because I'm in a line waiting to get there. So I think, you know, if the word was being passed down the line that's going over the bridge and people are turning away without actually getting to the threshold, they wouldn't fall under the statutory inspection mandate or processing mandate. The second question, I think, has to do with how arrival looks between ports. As a practical matter, the borderline isn't generally delineated in a way between ports that would allow for this kind of discernment about have you reached the threshold? It doesn't say whether or not at a port of entry. Yes. Yes. So we're going to get to that part next. So we take out at the port of entry when we're talking between ports, and the question is what does it mean to arrive in the United States? I think you would have to be at a place where you could, in fact, cross. So if you got up to, let's assume it's a place on the border where there is an actual line, identical line, I would say the same analysis applies, right? Have you made it to the threshold and you're about to step over? So anybody at the water's edge of the Rio Grande on the Mexican side has arrived in? No, the border is halfway through the water. All right. So they've got one step short of halfway through. They've arrived, but somebody who's on the water's edge has not arrived. I think that's right. So you're looking at being at the threshold of when you're going to cross. So somebody who's at the fence has arrived in, but somebody a step away from the fence has not arrived in? So we're talking about the border wall. Yes. The border wall is entirely on the interior, so, in fact, anyone who gets to the border wall is also physically present in the United States. So anybody who's arrived at the fence is in? Yes, but that's just a matter of geography, that they're already present. To take the hypothetical, though, what if there was a border wall exactly on the border line? There the analogy that I think of is a stadium. So I'm arriving at a stadium when I'm at the entrance going through the turnstile. I probably wouldn't describe myself as arriving in the stadium if I'm still on the perimeter making my way to a place where I can enter. So if they're at the top of the wall, they're in, but if they're at the bottom of the wall, they're out. Oh, so now they've climbed. I'm just trying to understand what it means. As soon as we decide what it means, we're going to get cases. As a practical matter, that's not going to be a concern because the wall is, in fact, within the perimeter. A hypothetical wall that was on the line and a person had gotten to the top and was about to fall over, How come somebody who's in the line isn't in? I mean, if the whole point is to make sure that people who are attempting to get into the country have had the opportunity to file asylum claims and they've made it all the way, why does it matter he's second in line? I think that's just a function of arriving in. So the whole debate boils down to the one person who's at the front of the line. Yeah, and I think that's because... So the rest of the case, you agree with the government on? No, I... Everybody else in the line, everybody else who's being metered doesn't have an asylum claim, just the person who's... They have an asylum claim, they have to get up to the border to present it. Now, I think maybe the question is if the government was stopping people from getting physically to the line, because if you're waiting in line and you just decide to abandon waiting and you don't actually make it to the... No, no, no, these people want to make these claims. They're there. Right. And they're being metered and they're told, no, not today. And you're saying the person who's made it up to the inspection officer gets to make that claim and everybody else who's been waiting there maybe for hours or days doesn't. Well, they just then, once they get up there, can make the claim. So they have to get up there, yeah. Yeah, but there's no reason to think they wouldn't be able to do that. And I think it's important to remember that from 1917 to 2016, 99 years, there was not a single example of a turn back. So what was happening is people would come through the port. At that point, when they were in the port, they would be inspected and processing would happen. So it's an unusual scenario we have here where we have the officer standing there and turning people back. And now we have these expedited removal processes at the border. Yes. So many of them are not getting in at all, but they're coming to the line and they're at least being questioned and permitted to make the claim. Under the expedited, if they were being applied the way they were supposed to. I think your point that you're making is the statute is very clear that anyone in the U.S. Now, the other side says a foot. I don't know why the foot is magical. I could put my hand through or my nose through. I don't know. Why does a foot count as opposed to a piece of your body count? So if you're up on the top of this wall that's not on the U.S. side. But my point is, in asking or clarifying this question, is arriving at the border means you're knocking on the door, correct? That is what it has meant for 99 years. Mr. Suri suggested that's not what it meant, that that's not what the federal regulations said, that that's not what practice was. Was he simply wrong about that? In reading the papers, I understood that up until 2016, anyone who knocked on the door had the opportunity to make the claim and they weren't guaranteed success, but they could make the claim. That's right. So the government purports to cite a few earlier cases, which it says support its position. That's Leng Mei-Ma, Hong Kwai-Chu, Meze, the Ellis Island case. All of the cases that the government is citing, it cites are playing fast and loose with entry. So each one of those non-citizens was present in the United States, arrived in the United States, at which point they were subject to exclusion proceedings. That's the statutory process that you got if you arrived and then you weren't actually admitted or physically present in the country. We're just looking for the statutory process to be applied to our class members or we were when this policy was in effect. I just want to make sure I understand exactly. There's a line of 50 people trying to get in. The first one knocks on the door, so maybe he or she is processed. I don't know how many people are there processing, but if there's one person there, maybe person 3 to 50, they don't have a claim, right? Yes. Yes or no? Do they have a claim or not? It's going to depend on whether it's a reasonable delay. What do you think a reasonable delay is? That's under 706-1. I think Justice Sotomayor made the point earlier that the Ninth Circuit made a determination that this was complete withholding because there was no ability to wait. So it's not knocking on the door. It's getting your name on it. It's a turnstile if you're at a land port and there's a plaque halfway across the bridge, so it's not a physical door. But yes, so when you go through the line, if it's working the way it should, you should make your way up to the borderline at which point you come across and you are processed. Maybe I just don't understand. It depends on how long the line is, right? Yes. There are non-examples prior to the turnback policy, even during the turnback policy, of there being kind of lines of people waiting to be processed who are outside of the United States because under the prior practice you came through the turnstile and then you were inspected and processed. Now there could have been long waits within the port. That certainly happened, and that would have been subject to kind of a reasonable delay analysis. But this idea of kind of lines and people piling up on the Mexican side of the border didn't happen until the turnback policy was put in place, and you've got this bottleneck of people waiting on that side. I understand that, but I'm still struggling with the Chief's question. And we do have situations where there are lines, and I had thought you had said to me and Justice Sotomayor and others that the first person at the turnstile with the inspection officer has arrived, but people further back in the line haven't. And now I thought I heard a different answer to the Chief Justice, and I'm just wondering, I really do, whatever you think it is, I want to know what it is. I think I was skipping ahead when I answered the Chief's question to kind of the nature of the 7061 claim and the difference between withholding. I'm just curious what arrives in means. Arrives in means you reach the threshold. I didn't mean to create confusion about that when I was answering the question. Okay, so it's the person at the turnstile, it's the person halfway through the Rio Grande, not somebody, two people back, not one person back, not one person who can't reach across the halfway point of the Rio Grande, none of that. You have to reach the threshold in order to be subject to the 1225 mandate. So how does that fit, Ms. Corcoran, with 1225B1Ai, which says if an immigration officer determines that an alien who's arriving in the United States is inadmissible, the officer shall order the alien removed from the United States. Now, to me, that suggests not, you remove somebody from the United States when they already have crossed the threshold, not when they are knocking at the door. So that suggests to me that arriving in suggests that they've already crossed. So it's a process of arrival. So the person is arriving in when they are about to step over the threshold, and again, I would go to the plain meaning and think about being in a house or a yard. If my husband called and said, are you arriving at the house as I'm walking to the door, and I said no, that would be a strange answer to give him. The ordinary meaning is yes, I am. But if it's arriving in, the officer shall order the alien removed from the United States, that seems to suggest that your view of plain meaning, whether it is plain or not, is not the statutory meaning, because if you're removing somebody from the United States, that person has clearly made it over to the United States. You don't remove somebody from the United States when they're just knocking at the door. Well, so I think that provision makes sense if you remember that removal is a legal term. It refers to removal proceedings. So what that provision is assuming is the completion of arriving. In 1996, when Congress was drafting the language, it had no reason to think that 20 years later the government was going to change its position and start blocking people while they were in the process of arrival. So you see in the regulations, and I think also in SAIL, kind of the understanding that the process of arrival starts when the person is at the threshold and it continues as they step over the threshold and are being inspected. So I don't think there's an inconsistency there. So to clarify, when the person is arriving at the threshold, the process of inspection you say kicks in based on their arrival, and that process could take place on U.S. soil. Presumably, without metering, the inspectors are on the U.S. side, and so they're asking and they're investigating, and the person is in the U.S. at that point. But the obligation to do that kind of inspection, I think you're saying, kicks in based on the person's arrival. Yes, that's exactly right, and it makes sense when you remember that that is how it had worked from 1917 to 1996 when Congress was amending the provisions in IRS. It will be interesting to read the actual transcript of the oral argument because I believe that both you and Justice Sotomayor and Justice Jackson, on several occasions, have used the phrase arriving at. I think you said you arrived at your house, but that's not the term that is in the statute. Do you think there is no difference between arriving at a location and arriving in the location? Yes, thank you for the opportunity to clarify. So we have in the United States at a port of entry. I can explain the amendment history on how we ended up with the prepositional phrases in that order, but I think my first order answer is in is just how you describe being in a region. You wouldn't say at the United States. You would say in the United States. I'm arriving in Baltimore when I'm on the train as it's coming in. I am at Penn Station when I'm in New York. So that's the difference in prepositional phrases, which even if it doesn't completely answer the question, does give you some pause to say, well, maybe in isn't doing the work that the government is suggesting here because it has to do with kind of the natural way that we talk. But the way we ended up with that order of the prepositional phrases is that the pre- Well, I'm not quite sure I understand that. So there's been talk about knocking at the door. Do you think someone who comes to the front door of a house and knocks at the door has arrived in the house? The person may have arrived at the house. No, but that's past tense. Are they arriving in the house? Does a person arrive in the house when the person is not in the house and is knocking at the door asking to be admitted to the house? Yes, I think here the door is open. The officer is standing on the other side of the threshold. The person gets there and is ready to take the step over. The officers and the asylum seekers here were toe to toe. This was happening right at the line. And they're about to step over. They are arriving present tense. Once they're inside, they've arrived past tense, but we know that Congress used the present tense here. Well, I gather you think it makes a difference. Whether there is a door or a turnstile, you have to be there. If you're at the end of a long line, you're not there. You haven't arrived at the turnstile. Yes. Okay, so then does it matter how many people are processing the arrivals? I mean, how quickly the line is going to move? It strikes me as a very significant factual question. In other words, if you're at the end of a line, you're not covered by the requirement to process. Is that right? Yes. So once you get to the, you have to arrive, and that's just the nature of the language that Congress used. However, if the government was complying with the inspection and processing mandate, people would be going right through the turnstile. There is no stopping or processing that happens at the turnstile under the prior practice. A person goes through, and at that point they are going to be- So you don't even have to knock? No, there was no knocking. You went through. There's no immigration officer who was stopping you. You're going straight through the open door. You are now in the inspection area. You're in the port. And at that point there would be perhaps a delay of processing for the reason you say. That delay would be subject to 7061, unreasonable delay. Here we had a complete withholding. But I think maybe where we're getting stuck is kind of the idea that processing is happening at the border. That only happens under the turnback policy. That's the only situation in which you're going to have immigration officers interacting with asylum seekers on the other side of the border. So historically, if you're at the end of the line, you still went through. There was no line. People just- Right, there was no line. This only became an issue, is what you're saying. And so arrives in wouldn't have had the significance in 1996, is what you're-based on a historical practice. And now we're trying to figure out what it means when there's a new practice not envisioned by Congress. Yes, that's right. And if I could go back to something you said earlier, which is the logic or the logical problem the government has with treating this kind of a change in language as if it suddenly substantially narrowed access to asylum at the port. Not only is that illogical, but it defies the express purpose that the text was seeking to achieve, to quote Justice Scalia. We know that the reason that Congress amended 1225A1 was to expand the category of applicants to include people who were already present in the United States and people who entered between ports because it needed to put them on equal footing. So to read that language as then redisadvantaging people who attempt to enter lawfully makes no sense at all. Can I ask you, this is a new practice. Justice Kavanaugh just said a new practice not envisioned by Congress. The Chief Justice says we have a significant factual question here about how this actually works. Why wouldn't we wait until we had an actual policy with real facts in the record regarding what's going on? I mean, even if this is not technically non-justiciable, even if there is jurisdiction in the literal sense, we do have some control over whether or not we reach and discuss issues. And it just seems to me that we have a lot of hypotheticals regarding how this policy may have worked in the past, how it's possibly going to work in the future, but we don't have a policy in effect right now that we can actually rule upon. So how should we take that into account as we think about this? Yes, thank you, Your Honor. So as we explained in pages 15, I think it's 21 of our brief in opposition, this case had virtually no ongoing significance, certainly not for the plaintiffs. Now the government has sought this court's review because it wants to preserve its degrees of freedom in the future. Right now the border is closed under other authorities, but maybe that's not true in the future and conditions change. That is not a reason for this court to grant plenary review. I mean, if the government were to just bring its own action, I think Mr. Suri has conceded that they wouldn't have standing because they don't have an actual plan in place that they're trying to implement. What they're doing is saying we have this, you know, essentially extant district court order out there, and at some point in the future we might want to have a policy like this. So Supreme Court, tell us now whether or not that's going to be unlawful. Yes, that's what they're seeking. That doesn't, you know, in order, as the court said in Cameron v. Green, both parties have to have a live interest in the case in order for the court to proceed. And that explanation doesn't go to how plaintiffs continue to have an interest in a declaratory judgment against a policy that was rescinded five years ago. And so I think it's odd to raise the voluntary secession exception here, where it's the defendant who wants to continue.  Usually voluntary secession is the defendant wanting to avoid the court's orders. They remove the policy so that the court doesn't order. Here we have them pointing to the voluntary secession as a reason for the court to weigh in on this policy. Right. And it's the government that's saying, you know, the government has control over the extent to which it's likely.  Counsel, do you think the Ninth Circuit was wrong to say that it was not moot then? You didn't challenge that in your brief. No, so what the Ninth Circuit said that the declaratory judgment was moot and the dissenting judge agreed. The reason that the Ninth Circuit reached its holding was because of the transit rule injunction, that smaller class, which at that point, that injunction was still in place and puts a number of obligations on the parties. So the Ninth Circuit was not wrong about that. But on remand, the parties agreed to essentially dissolve the injunction because the burdens that it was placing on the parties no longer had any benefit to the class members. The class members had been identified. So you're taking the position it's formally moot. I do think it's moot for the reason that... Why didn't you make that point in your brief? We wrote six pages of all the reasons...  Yes, in the brief and opposition. It wasn't until the reply in support of CERC that the government suggested months and more vacate her. I'll say we don't object to that. We didn't address it in our brief in opposition because that would be an odd thing for a respondent to suggest. And once the court granted review, we focused on the merits. But to Justice Jackson's point about months and more vacate her, we don't have an objection. And I think that resolves all of the government's concerns in this case. Thank you, counsel. Justice Thomas? Justice Alito? Anything further? On that last point, the court said the declaratory judgment, it was vacating that. And it's also vacated the preliminary injunction? No, so the declaratory judgment is still in place, but I think is moot for the reasons that the Ninth Circuit said. The Ninth Circuit went on to reach kind of the statutory interpretation question, not with respect to the declaratory judgment, but with respect to the transit rule injunction, which would only be in place if the underlying statutory question was resolved in the plaintiff's favor. But then that injunction was dissolved, so we really have nothing that's before the court at this point. Thank you. Justice Kagan? Is your position that when a person gets to the border, she has a right to apply for asylum only, or that she also has a right to enter? So enter, so a right to cross, I'll say. A right to cross. So I think the right to cross is tied up in the inspection and processing mandates that are on the government. So we have a 706.1 claim here. It's based on ministerial duties that attach the government under these circumstances. And if the United States figured out a way to do its various things that it has to do without having the person cross, would that be sufficient? You know, like you could have a Zoom interview or something like that. Yeah, I suppose that 1225 assumes that all this is happening on U.S. soil, and I think for good reason because that's how it already worked. The government's extraterritoriality concerns might weigh against doing some sort of process, but I don't know that I have a stake in pushing back on that way of approaching things. Okay. Justice Gorsuch, anything further? Just briefly. You mentioned the Court of Appeals revised opinion. It said it didn't think that the case was moved because of the equitable relief still present, which I think that took to mean both the declaratory judgment and the injunction, if I'm mistaken. So, yes, they were both left in place. The reason that the United States reached the underlying facts for interpretation question was because they were both in place. Yeah. Okay. Thank you. Justice Scalia? On that question that you made a point on about why Congress would give better treatment to those unlawfully in the country, I guess one response to that, and I just want to get your reaction, would be we should just interpret the rule in front of us or the statute in front of us by its terms and not try to figure out all the things that might be going on with people unlawfully in the country to try to make it all fit in some perfect world. Rather, there are lots of issues with people who are unlawfully in the country, but the only issue before us is trying to figure out what arrives in means and not worry about that. I just want to get your reaction to that. I'm not sure I followed the question. You were saying that if we interpreted it the government's way, that Congress would have been privileging people unlawfully in the country. My response or my question to you is, well, whatever is going on with people unlawfully in the country, the sole issue before us is trying to figure out what arrives in means when you're at the border, and whatever the effects of that are in terms of creating disparities, we can't sort all that out here. All we have to do is focus on the issue before us. So what's your reaction? Thank you. Sorry, it took me a little bit to get there. So I think it's less about advantaging people who are already in than it is about addressing the disparity incentives that Congress was trying to resolve in 1225. So under the government's framework, if you are an asylum seeker coming to the United States, you should not go to a port because you will be turned away. You need to cross the Rio Grande. You need to come in between ports. That is the exact opposite of what Congress was trying to accomplish there. The answer to that could be better enforcement of people coming in unlawfully, and Congress might have assumed, particularly in 1996, when there was an increased effort to prevent illegal immigration, that people wouldn't be flooding in unlawfully. That turned out not to be accurate, but that might have been the expectation in 1996. But I don't think that then explains what Congress was doing in 1225. It creates this applicant for admission category in order to unify the proceedings, the deportation exclusion proceedings. What the government is suggesting just makes all of that somewhat nonsensical. Okay, completely different question. Last one. This seems very artificial, trying to figure out at the threshold, on the line, in the middle of the river, because wherever the line is, the government is presumably going to stop you on the other side of that line and prevent you from getting to wherever the line is, right? So that you're getting across the line? Yes, so if we define it as the threshold, the government is going to stop you short of the threshold, or try to. I understand. And if we say 100 yards from the threshold, they're going to stop you 125 yards from the threshold. In other words, the point, I guess the arrives in thing seems kind of artificial. The whole question, the bigger question, it seems to me, is can the government physically stop people before they get to whatever that line is, no matter how we define it? And that seems like not a statutory question, more of an arbitrary and capricious question. Maybe I'm wrong. I just want to get your reactions to that. This whole idea if you're second in line or first, the government, wherever we define it, is going to stop you when they want to implement this policy on the other side of that line. Do you follow that? I do. And so I think that maybe the factual premise that's inaccurate there, that the port goes right to the borderline. So the government understands ports as being kind of that geographic space. So the threshold of the port is the borderline. So you can't really, if you move the threshold further in, then you have people who are present in the United States. If you move the threshold further out, well, now we're in Mexican territory and the government doesn't have authority to act there. Okay, so that's a good answer. How far into Mexico will the government go? Maybe they don't want to answer that. To stop people.  I think if the government starts going well into Mexico. Well into, is that 100 yards? I mean, 150 yards? That's not the threshold anymore. And will they go into it? I mean, again, you might not have the answer to this question. But the whole thing seems kind of artificial to me. Because the government is going, if they want to do this policy, they're going to stop you on the other side of the line. Yes, and I would say there that if we start to have the government kind of circumventing further into Mexico, whether it's 10 feet or 100 feet, we move out of the inspection and asylum processing mandates of 1-2-2-5. And now I think it's a question of just kind of ultra-viras acting without authority in another country. All right, thank you for your help. Justice Jackson? We don't have the answers to Justice Kavanaugh's good questions because there is no policy in effect, right? We don't know. That is right. I'm going to make that point as well. Right now we have a legal question that's unanchored from any actual practice before the court. Thank you. Thank you, counsel. Rebuttal, Mr. Suri? Just a few quick points, Mr. Chief Justice. First, this court should decide this case. The case is not moot because there is still effectual relief that the court could award, namely lifting the class-wide declaration and the individual injunction to which the government is still subject. There's also a strong practical reason for the court to decide this case. Administrations of both parties since 2016 have consistently said that this is an important tool in the government's toolbox for dealing with border surges when they occur. I can't predict when the next border surge occurs, but I can say that when it does occur, this is a tool that DHS would want in its toolbox. It's not something the court should leave to future uncertainty. We've been faulted here for not having a specific policy in place, but that's not really fair to us. There's a class-wide declaratory judgment saying that this practice is unlawful, and I think the government should not be faulted for conforming its current conduct to what a court has declared to be the law. Once that declaratory judgment is lifted, we'll take appropriate steps at that time. Second, the text of the statute should control the court's decision, and that text is arrives in the United States. We've heard attempts to substitute other language that might be more ambiguous or more susceptible to respondents' interpretation than the language Congress actually used. For example, we've heard many references to arriving in the United States, but the specific language at issue here is arrives, not arriving. Further, as Justice Kagan correctly pointed out, there's a separate provision of Section 1225 that says that arriving aliens can be removed from the United States in certain circumstances, and that suggests that even the arriving category is limited to aliens who've already crossed the border. Even if you think that there is some ambiguity in the term arriving, though, the correct approach is to use the clarity of arrives to resolve the ambiguity in arriving. You shouldn't use the ambiguity potentially in arriving as an excuse to ignore the clear word arrives. Similarly, we've heard attempts to replace arrives in the United States with arrives at a land border or arrives at the threshold or knocks on the door. None of those terms are the terms Congress actually used in the statute. Moreover, even when a previous version of the statute said arrives at a land border, this Court still interpreted that to refer to aliens in the United States. We've relatedly heard a suggestion that the alien arrives at the port of entry because the port goes right up to the border. We don't think that's accurate. The entrance to the port might be something like a quarter mile from the border. So even if you think the question is whether the person arrives at the port, the person hasn't arrived at the port. More importantly, the real question is whether the person arrives in the United States. Finally, respondents' position raises serious line-drawing problems. It's not clear from their position whether you have to be at the front of the line, the back of the line, or the middle of the line. It's not clear whether they're distinguishing between someone who is stopped by a border officer versus someone who is stopped by the Rio Grande versus someone who is stopped by the border wall versus someone who is stopped by Mexican authorities working in concert with the United States, which is something that could happen in response to Justice Kavanaugh's question. I don't think we'd ourselves go into Mexico, but we could cooperate with Mexican authorities to stop people from reaching the border of the United States. Our position avoids all of those line-drawing problems because Congress drew a clear line here. It said that if you're outside the United States, you can apply for refugee admission under Section 1157. If you're in the United States, whether you've been here for a long time or you've just arrived, you can apply for asylum. The court should respect the line that Congress drew. Thank you, Counsel. Case is submitted.